UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                CIVIL ACTION NO:

_____

| | |
|---|---|
| VALERIE ABBOTT, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| ST. JOHN'S RIVERSIDE HOSPITAL; | ) |
| THERESA DERING; | ) |
| AND NORA DONAHUE, | ) |
| | ) |
| Defendants | ) |

_____ )

## COMPLAINT AND JURY DEMAND

### Parties

1.      The Plaintiff, Valerie Abbott ("Ms. Abbott" or "Plaintiff"), is a 61-year-old female resident of the State of New York residing at 354 Oak Drive, New Windsor, New York, 12553.

2.      Defendant, St. John's Riverside Hospital (the "Company") is incorporated as a not-for-profit hospital in the state of New York and operates a facility located at 967 North Broadway, Yonkers, New York, 10701.

3.      Defendant Theresa Dering ("Ms. Dering") is an adult female and, upon information and belief, resides in Pennsylvania.  At all relevant times, Ms. Dering was the Administrative Director for the Company's clinical laboratories department. Ms. Dering is named in both her individual and official capacities.

4.      Defendant Nora Donahue ("Ms. Donahue") is an adult female and, upon information and belief, resides in New York.  At all relevant times, Ms. Donahue was the Human

Resources Director for the Company. Ms. Donahue is named in both her individual and official capacities. (The Company, Ms. Dering, and Ms. Donahue, collectively, the "Defendants").

**Jurisdiction and Venue**

5.      This court has subject matter jurisdiction under 28 U.S.C. §1331 because Ms. Abbott has brought a claim pursuant to the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621 *et seq.*, the Americans with Disability Act ("ADA") 42 U.S.C. §§ 1201 *et seq.*, and the Family and Medical Leave Act ("FMLA") 29 U.S.C. §2615.  The court may exercise supplemental jurisdiction over Ms. Abbott's state law claims.  28 U.S.C. §1367.

6.      Venue is appropriate in the Southern District of New York as the Company's principal place of business is located in the Southern District of New York and/or the acts or omissions giving rise to the claims in this Complaint occurred in the Southern District of New York.

7.      The court has jurisdiction over the Company because the Company's principal place of business is in Yonkers, New York and because the Company has engaged in and transacted business in the State of New York, including by managing and/or operating a business in New York and/or employing the Plaintiff in New York. Indeed, the Plaintiff was employed by the Company in the State of New York, was managed by the Company in the State of New York, and was terminated by the Company in the State of New York.

8.      The court has jurisdiction over Defendant, Ms. Dering (in both her individual and official capacity), because Ms. Dering availed herself of New York law by transacting business, including being employed by the Company, managing and terminating employees, including Ms. Abbott, in the State of New York.

9.      The court has jurisdiction over Defendant, Ms. Donahue (in both her individual and official capacity), because Ms. Donahue, upon information and belief, is a resident of New York and because Ms. Donahue availed herself of New York law by transacting business, including being employed by the Company and/or managing and terminating employees, including Ms. Abbott, in the State of New York.

### Statement of Facts

10.      In or around September 2017, Ms. Abbott began her employment with the Company as a Blood Bank Supervisor based in the Company's hospital facility in Yonkers, NY.

11.       At all relevant times, the Company employed 20 or more employees for 20 or more calendar weeks during the preceding 12 months.

12.      As such, at all relevant times, the Company was a covered employer under the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the New York State Human Rights Law.

13.      Indeed, at all relevant times, the Company was engaged in an industry affecting commerce and employed 50 or more employees during 20 or more calendar weeks in each current and/or preceding calendar year.

14.      As such, at all relevant times, the Company was a covered employer under the Family and Medical Leave Act ("FMLA").

15.      At all relevant times, Ms. Abbott was a qualified employee and her job performance was satisfactory.

16.      In fact, due to her performance, Ms. Abbott was awarded with a pay raise.

17.      Prior to beginning her employment with the Company, Ms. Abbott was diagnosed with type 2 diabetes, cardiac disease, and chronic obstructive pulmonary disease ("COPD").

18.     Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, lifting, bending, concentrating, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself). Furthermore, Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) also substantially impair one or more major bodily function, including, but not limited to, Ms. Abbott's endocrine, circulatory, and/or respiratory systems.

19.     Accordingly, Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) were and are disabilities under state and federal law.  As such, during all relevant times, Ms. Abbott was disabled under both state and federal law.

20.     Prior to Ms. Abbott's employment with the Company, Ms. Abbott also suffered from physical impairments, including the chronic medical condition known as "drop foot," as well as compartment syndrome.

21.     Ms. Abbott's drop foot and compartment syndrome (each individually and both collectively) are physical impairments that substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, exercising, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself).

22.     As such, Ms. Abbott's drop foot condition and compartment syndrome (each individually and both collectively) were and are disabilities under state and federal law.  As such, during all relevant times, Ms. Abbott was further disabled under both state and federal law.

23.     Prior to her employment with the Company, Ms. Abbott underwent surgery related to her drop foot condition, where the muscle from the back of Ms. Abbott's lower right leg was removed.

24.     The surgery was ultimately unsuccessful and, as a result, Ms. Abbott suffered severe complications. Due to the failed drop-foot related surgery, it was medically necessary that Ms. Abbott receive a skin graft on her lower right leg. Although Ms. Abbott's skin graft surgery was successful, the resulting graft on Ms. Abbott's leg did not fully heal and would periodically rupture due to strain and/or stress.

25.     For example, the skin graft would periodically reopen if Ms. Abbott engaged in substantial walking or standing and once ruptured, it occasionally became necessary for Ms. Abbott to utilize a wheelchair or a scooter in order to move about.

26.     Ms. Abbott's chronically vulnerable skin graft and, when ruptured, the chronic open wounds (each individually and both collectively) are physical impairments (both on their own and in connection with Ms. Abbott's underlying Drop Foot condition) that substantially limited one or more of Ms. Abbott's major life activities, including but not limited to, Ms. Abbott's walking, standing, exercising, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself).

27.     Furthermore, Ms. Abbott's skin graft wounds were exacerbated by her underlying diabetes disability, as the chronic wounds associated with the skin graft would take much longer to heal due to Ms. Abbott's body's impeded ability to heal damaged tissue and/or her blood flow/circulation impediment.

28.     Indeed, Ms. Abbott's skin graft wounds and the resulting chronic open wounds (each individually and all collectively) are disabilities under state and federal law.  As such, Ms. Abbott was and is further disabled under both state and federal law.

29.     When Ms. Abbott began employment at the Company, she reported to and was supervised by Theresa Dering ("Ms. Dering").

30.     Upon information and belief, Ms. Dering is a non-disabled individual who is younger than Ms. Abbott.

31.     Ms. Abbott disclosed her disabilities to the Company.

32.     Indeed, Ms. Abbott disclosed details of her diabetes, her drop foot surgery, and the associated skin graft condition to her supervisor, Ms. Dering, including the chronic wound's inhibited healing process and the fact that her skin graft condition and the associated symptoms would flare up due to excessive standing, walking, and/or when strained.

33.     While employed at the Company, Ms. Abbott found that she was frequently required to park some distance away from the office, which would have required her to walk an excessive distance, which would have been difficult because of her disabilities.

34.     Due to this, in or around September 2017, Ms. Abbott contacted an employee in the security department (name unknown "security employee") and disclosed her disability and further requested the disability-related reasonable accommodation of being able to utilize a handicapped parking space.

35.     The security employee was dismissive of Ms. Abbott and claimed that he did not believe that Ms. Abbott deserved to be given a handicapped parking space and thus denied Ms. Abbott's requested disability-related accommodation. He further informed Ms. Abbott that she was not allowed to park in the handicapped parking spaces because they were reserved for the

valet parking (and therefore indicated the handicapped spaces were being used improperly for nonhandicapped individuals).

36.     Indeed, it was clear that the Company was denying Ms. Abbott's requested accommodation and/or refusing to engage in a dialogue concerning this request.

37.     Ms. Abbott proceeded to raise protected concerns to Ms. Dering regarding the treatment that she had been subjected to when requesting a handicapped parking space.

38.     Ms. Abbott requested that Ms. Dering convey her (Ms. Abbott's) complaint through the appropriate channels.

39.     Ms. Dering curtly refused to convey the complaint on Ms. Abbott's behalf, and seemed annoyed by Ms. Abbott's expression of protected concerns.

40.     Indeed, there was no meaningful response to Ms. Abbott's protected concerns regarding the discriminatory treatment Ms. Abbott was being subjected to by the Company.

41.      Ms. Abbott also spoke with the security supervisor, Henry Coleman ("Mr. Coleman"), and reiterated her disability-related reasonable accommodation request of being given a handicapped parking space for the Company's parking lot so that she could park closer to the building (and thus avoid excessing walking).

42.     Upon information and belief, Mr. Coleman is a non-disabled individual.

43.     In response, Mr. Coleman dismissively denied Ms. Abbott's requested disability-related accommodation and told her she could not park in the handicapped designated spaces. Mr. Coleman reiterated that the handicapped spaces were reserved for the valet parking, thus indicated that the handicapped spaces were being improperly used by nonhandicapped individuals.

44.     Based on Mr. Coleman's reaction, it was clear that Ms. Abbott was being discriminated against and the Company was further refusing to enter into an interactive dialogue with Ms. Abbott about her requested accommodations.

45.     It was also clear that this treatment of Ms. Abbott was discriminatory based on her age, as Ms. Abbott noticed that she was often treated more negatively and harshly than other younger employees.

46.     On or around October 20, 2018, the Company took ownership of a new blood analyzer machine. As the supervisor, Ms. Abbott was responsible for training other employees on how to use the new equipment for several weeks.

47.     In order to complete the training for each of the employees, Ms. Abbott was required to being constantly on her feet, including through continuously standing, for excessive amounts of time.

48.     The increased amount of time spent on her feet resulted in excessive strain and stress on Ms. Abbott's disabilities and began to result in a flare up related to her disabilities.

49.     Ms. Abbott contacted Ms. Dering and requested the reasonable disability-related accommodation of being provided with a stool she could sit on, which would help lessen the strain and/or stress on her skin graft condition that was now being exacerbated due to the excessive standing during the training process.

50.     Ms. Dering was dismissive of Ms. Abbott's request and declined to engage in an interactive dialogue.

51.     In fact, Ms. Abbott requested this accommodation several times throughout her employment with the Company. Despite the fact that this request was not an undue burden on the Company, Ms. Dering would typically instead tell Ms. Abbott that she knew about the

accommodation request, but would otherwise fail to provide any meaningful response (and would not grant the accommodation).

52.    Indeed, Ms. Abbott did not receive the stool as requested when she made these requests.

53.    Based on Ms. Abbott's numerous requests, the repeated lack of dialogue in response to her requests, and ultimate denial of Ms. Abbott's requested accommodations, it was abundantly clear that the Company had failed to engage in an interactive dialogue with Ms. Abbott regarding her numerous disability-related accommodation requests (and continued to do so throughout her employment).

54.    Furthermore, on or around November 27, 2018, Ms. Abbott experienced a severe flare up of her disability-related symptoms, as Ms. Abbott's chronic wound related to the skin graft had ruptured and worsened. Indeed, the worsening of Ms. Abbott's skin graft wound was related to Ms. Abbott's body's impeded ability to heal damaged tissue and/or blood flow/circulation impediments and further exacerbated by Ms. Abbott's increased time spent standing and/or walking.

55.    In or around December 2018, Ms. Abbott contacted Ms. Dering and raised protected concerns about the repeated denials of her accommodation requests, noting her concern that, despite requesting it, she still did not have access to a stool to accommodate her disabilities, and conveying that her medical condition was worsening due to the denial of her requested disability-related accommodation(s) (indeed, resulting in the worsening of her chronic skin graft wound).

56.    While the lab manager, Rosemarie Schmidt ("Ms. Schmidt"), did provide Ms. Abbott with a stool at this point, the stool was impractical for Ms. Abbott's disability-related

needs. Indeed, the stool was broken and wobbly, and therefore was ill-suited to safely support Ms. Abbott's weight.

57.    Upon information and belief, Ms. Schmidt is a non-disabled individual who is at least ten years younger than Ms. Abbott.

58.    Ms. Abbott contacted Ms. Dering and requested the reasonable disability-related accommodation of a more stable replacement stool so that she (Ms. Abbott) could properly lessen the exertion and/or strain on the skin graft wound.

59.    Ms. Abbott was eventually provided with a replacement stool. However, just one day after she began to utilize her requested accommodation, she was subjected to harassing behavior, retaliation, and/or discrimination from other employees in her department, including Johnny Marquis ("Mr. Marquis"), the phlebotomy supervisor.

60.    Upon information and belief, Mr. Marquis is a non-disabled individual who is at least 10 years younger than Ms. Abbott.

61.    Despite the fact that the stool was clearly provided to Ms. Abbott as a disability-related accommodation, Mr. Marquis removed Ms. Abbott's stool in a clearly hostile, aggressive, and harassing manner.  This prevented Ms. Abbott from utilizing her requested accommodation.

62.    In response to Mr. Marquis behavior, Ms. Abbott raised protected concerns to Mr. Marquis and informed him that it was improper to remove the stool, as it was a disability related accommodation.

63.    Mr. Marquis declined to acknowledge Ms. Abbott's protected concerns.

64.    After Mr. Marquis improperly removed Ms. Abbott's disability-related accommodation (the stool), Ms. Abbott was again forced to walk and stand excessively, thus causing increased strain on her disability-related conditions.

65.    In response to Mr. Marquis's behavior, Ms. Abbott raised protected concerns to Ms. Dering. Ms. Abbott further reiterated her disability-related accommodation request, as she had been effectively denied her requested accommodation when Mr. Marquis improperly removed the stool.

66.    Ms. Dering brushed off Ms. Abbott's concerns, and the stool was never returned to Ms. Abbott. Thus, Ms. Abbott was denied her requested accommodation of the stool being returned or being given a replacement stool.

67.    Furthermore, upon information and belief, Mr. Marquis was not subjected to any meaningful discipline regarding this incident.

68.    Again, Ms. Abbott noticed that she was often treated more negatively and harshly than other younger employees. For example, upon information and belief, other younger (and/or non-disabled) employees were freely provided with the use of a stool upon request.

69.    In addition to Mr. Marquis's improper conduct, Ms. Abbott also experienced harassing behavior, discrimination, and/or retaliation from another employee in her department, Renata Howington ("Ms. Howington").

70.    Indeed, upon information and belief, Ms. Howington was a non-disabled lab analyst who was at least 20 years younger than Ms. Abbott and who would consistently yell, scream, and degrade Ms. Abbott in an aggressive and/or hostile manner, seemingly because of Ms. Abbott's disability and/or age.

71.    Notably, upon information and belief, Ms. Howington did not treat other younger and/or non-disabled employees in this manner.

72.    When Ms. Abbott raised protected concerns to Ms. Dering about Ms. Howington's discriminatory behavior, Ms. Dering ignored Ms. Abbott's very serious concerns

and instead dismissively acknowledged that Ms. Howington did not have a "filter" when she (Ms. Howington) talked.

73.     Upon information and belief, Ms. Howington was not disciplined in any meaningful manner regarding her discriminatory and improper treatment of Ms. Abbott.

74.     In or around January 2019, Ms. Abbott's medical condition worsened. Ms. Abbott experienced more severe and more frequent flare ups related to her disabilities, including, but not limited to, increased and worsening pain.

75.     Indeed, Ms. Abbott's doctor recommended that Ms. Abbott undergo two additional skin graft surgical procedures due to her worsening condition.

76.     Around this same time, Ms. Abbott contacted Ms. Dering and notified the Company that she was undergoing medically necessary procedures related to her chronic skin graft wounds that were scheduled for on or around February 12, 2019 and on or around February 19, 2019.

77.     On or around February 12, 2019, Ms. Abbott underwent surgery related to the chronic wound and received a skin graft.

78.     Shortly after Ms. Abbott informed the Company of her worsening medical condition, the flare ups of her symptoms, and the disability-related skin graft surgeries, Ms. Abbott was subjected to further discrimination and/or clear retaliation.

79.     For instance, Ms. Dering became more dismissive of Ms. Abbott and she would often refuse to acknowledge Ms. Abbott's communications and/or deliberately brush Ms. Abbott off.

80.     Furthermore, just one day after Ms. Abbott's surgery, on or around February 13, 2019, Ms. Dering assigned Ms. Abbott to work bench over the weekend.

81.     This assignment was very unusual for Ms. Abbott, as an individual assigned to work bench was responsible for conducting all lab tests on blood samples, which was outside of Ms. Abbott's standard job responsibilities as a supervisor.

82.     Notably, work bench responsibilities also involved a substantial amount of walking and standing, more so than the normal daily responsibilities that Ms. Abbott typically performed.

83.     On this occasion there were other non-disabled individuals who could have been assigned to work bench, and whom it indeed would have been more typical to assign to work bench instead of Ms. Abbott.

84.     As such, it was clear that Ms. Dering's assignment to Ms. Abbott was a deliberate action that was not only motivated by discriminatory and/or retaliatory animus but also in complete disregard for Ms. Abbott's prior concerns regarding the potential of excessive standing to exacerbate her disability symptoms and the fact that she had just undergone disability-related surgery.

85.     In response, Ms. Abbott raised concerns to Mr. Dering about the work bench assignment, particularly in light of the fact that Ms. Abbott had recently undergone the skin graft procedure and therefore risked rupturing the graft if she strained it due to the excessive walking and standing caused by this abnormal assignment.

86.     Ms. Abbott further requested the reasonable disability-related accommodation of being reassigned from work bench during the period of her recovery from her surgery. Notably, this request was not an undue burden on the Company, as there were numerous other employees who could be rotated into the work bench assignment (nor was work bench within Ms. Abbott's typical job duties as a supervisor).

87.     Although Ms. Dering begrudgingly re-assigned Ms. Abbott from working bench that weekend, Ms. Dering thereafter began to periodically schedule Ms. Abbott to the work bench position throughout the remainder of Ms. Abbott's employment.

88.     In fact, Ms. Dering began to assign Ms. Abbott to more weekend work once Ms. Abbott notified the Company of her worsening disability and health condition.

89.     Indeed, this was despite (and perhaps because of) Ms. Abbott's accommodation request and/or the fact that Ms. Abbott had raised disability-related concerns about this type of work assignment.  It was clear that Ms. Dering was refusing to engage in an interactive dialogue concerning Ms. Abbott's request not to be assigned to work bench and that Ms. Dering's assignments were motivated by discriminatory animus.

90.     Furthermore, Ms. Dering's actions were a retaliatory attempt to harass Ms. Abbott by assigning Ms. Abbott the less desirable and more strenuous shifts.

91.     On or around February 19, 2019, Ms. Abbott underwent another skin graft procedure related to the chronic wound.

92.     Over the course of the next few months, Ms. Abbott's disability-related symptoms continued to worsen, in part because of the Company's failure to grant the reasonable accommodations that Ms. Abbott had requested (such as the accommodation of periodically using a stool while at work).

93.     Indeed, on or around March 7, 2019, Ms. Abbott's chronic wound related to the skin graft worsened, which may have been caused or exacerbated, in whole or in part, by the excessive walking and standing required of her at work due to the failure of the Company to provide requested reasonable accommodations.

94.     Around this same time, due to the severity of the flare up related to Ms. Abbott's disabilities and based on her doctor's recommendations, Ms. Abbott began utilizing a disability-related accommodation of a walking aid (including a walking boot and subsequently a scooter) to aid her mobility.

95.     Ms. Abbott also was continuing to endure ongoing discriminatory and/or retaliatory behavior from other employees in her department, such as Ms. Howington. As a result, on or around March 12, 2019, Ms. Abbott emailed Ms. Dering and raised protected concerns regarding the hostile and harassing treatment that she was being forced to endure.

96.     In her email raising protected concerns, Ms. Abbott specifically requested that she be treated in the same non-hostile and non-harassing manner as the non-disabled and/or younger employees. However, there was no meaningful response provided to Ms. Abbott's very serious concerns.

97.     In or around April 2019, Ms. Abbott was experiencing a particularly severe flare up of her disabilities, including symptoms (such as debilitating pain) related to the chronic skin graft wound.

98.     On or around April 23, 2019, Ms. Abbott notified the Company of her worsening condition and applied for the disability-related accommodation of a continuous medical leave protected under the FMLA.

99.     Notably, at all relevant times, the Company employed 50 or more employees within a 75-mile radius of where Ms. Abbott's worksite.

100.    Accordingly, at all relevant times, the Company was a covered employer under the FMLA.

101.    As of April 2019, and at all subsequent times during her employment, Ms. Abbott had been an employee for at least 12 months and had worked in excess of 1250 hours during the preceding 12-month period. As such, Ms. Abbott was eligible for continuous FMLA leave and was entitled to take such leave.

102.    Indeed, Ms. Abbott's disabilities (each individually and all collectively) constituted serious medical conditions causing periods of incapacity, continuing treatment, and/or ongoing care and therefore served as a legitimate basis for protected leave for FMLA purposes.

103.    Ms. Abbott's request for continuous FMLA leave was approved.

104.    Ms. Abbott therefore commenced her approved FMLA leave.

105.    In or around June 2019, Ms. Abbott underwent a disability-related surgery where a stent was inserted into her common iliac artery (the main artery of the pelvis), in an attempt to improve Ms. Abbott's circulation (and therefore increase Ms. Abbott's blood flow to help the healing process of her chronic skin graft wound).

106.    In or around the beginning of July 2019, Ms. Abbott's doctor recommended that she remain out of work for a short period to continue to recuperate and/or to undergo further treatment for her disabilities and/or disability-related symptoms.

107.    Indeed, Ms. Abbott continued to receive ongoing care and treatment throughout this period, including hyperbaric oxygen therapy, debridement, dressing changes, and apligraf (skin grafting) procedures.

108.    Around this same time, Ms. Abbott contacted the Company and requested the disability-related accommodation of around two weeks of additional disability-related leave based on her doctor's recommendation (until approximately on or around July 29, 2019).

109.    Ms. Abbott further provided the Company with medical documentation from her doctor, confirming her need for a disability-related accommodation of leave to obtain further treatment.

110.    Ms. Abbott's requested accommodation was approved by the Company, and thus Ms. Abbott was led to believe that she would be allowed to return to her job at the end of this slightly extended disability-related leave.

111.    Ms. Abbott experienced some continued complications related to her recovery and continued to experience disability-related symptoms during July 2019. Although Ms. Abbott continued to receive ongoing care such as regular hyperbaric oxygen therapy and debridement treatments, she was still experiencing severe pain, irritation, and swelling related to her chronic wound.

112.    On or around July 25, 2019, Ms. Abbott's doctor recommended that she remain out of work for an additional short period to undergo further treatment related to her disabilities and/or disability-related symptoms and/or to receive further recovery time (until on or around August 12, 2019). Ms. Abbott contacted the Company and further requested the disability-related accommodation of medical leave based on her doctor's recommendation.

113.    Ms. Abbott provided the Company with medical documentation from her doctor certifying her need for the requested disability-related accommodation.

114.    Ms. Abbott also clearly conveyed to the Company that she intended to return to work on or around August 12, 2019 and was confident that she would be able to return to work on that date.

115.    Notably, this request was not an undue burden on the Company, as Ms. Abbott provided the Company with advance notice of her requested accommodation and contacted the Company prior to her previously discussed return to work date.

116.    The Company never engaged in any interactive dialogue with Ms. Abbott concerning her disability-related reasonable accommodation request.

117.    Instead, on or around Friday, July 26, 2019, in its first communication of any type in response to Ms. Abbott's disability-related accommodation request, Annie Russo ("Ms. Russo"), the Senior Human Resources Coordinator for the Company, provided notice to Ms. Abbott that Ms. Abbott's accommodation request was being denied.

118.    Ms. Russo further demanded that Ms. Abbott return to work on the following Monday, July 29, 2020 and provide a letter from her (Ms. Abbott's) doctor clearing her to return to work at that time.

119.    Upon information and belief, Ms. Russo is a non-disabled individual who is younger than Ms. Abbott.

120.    Ms. Abbott contacted Ms. Russo and attempted to discuss the Company's sudden denial of her requested accommodation with Ms. Russo, particularly in light of the fact that the Company had only given her two days advance notice (when, upon information and belief, it was Company policy to provide five days of advance notice for requests such as this) and/or the Company's request for Ms. Abbott to obtain a clearance note was unreasonable, as the doctor's office was not able to provide a note with such limited notice outside of regular business hours.

121.    Ms. Russo was dismissive of Ms. Abbott's communications, and instead directed her to speak with Ms. Dering.

122.    Ms. Abbott was shocked by Ms. Russo's communications, and proceeded to promptly contact Ms. Dering. Indeed, Ms. Abbott attempted to call Ms. Dering several times, but was unable to reach her. On or around July 29, 2019, Ms. Abbott also emailed Ms. Dering and attempted to engage in an interactive dialogue concerning her requests and proposed an alternative disability-related accommodation that could allow her to return to the office very quickly.

123.    Indeed, Ms. Abbott noted, "I will ask Dr. Patel if I can come back with the boot and possible the scooter…. I will be in [to the doctor's] Thursday for a dressing change and another graft… Can I have [un]till Monday to get the return to work letter from [Dr.] Patel. Please let me know if this is acceptable."

124.    Indeed, it was clear that because the Company had suddenly rejected her prior accommodation request without any dialogue, Ms. Abbott was proposing a less burdensome alternative accommodation request involving a sooner return to work date of Monday, August 5, 2019 (approximately one week less than her initial request of August 12, 2019), as well as the accommodation of being allowed to temporarily utilize a walking boot and/or scooter at work as she continued to recover.

125.    Ms. Dering did not grant Ms. Abbott's modified accommodation request and did not engage in any interactive dialogue concerning this request.

126.    Desperate to keep her job, Ms. Abbott contacted Nora Donahue ("Ms. Donahue"), the Director of Human Resources.

127.    Upon information and belief, Ms. Donahue is a non-disabled individual who is more than 10 years younger than Ms. Abbott.

128.    Ms. Abbott explained to Ms. Donahue that she was currently utilizing the approved disability-related accommodation of leave and further raised protected concerns about Ms. Russo's seemingly discriminatory and/or retaliatory correspondences, including her failure to grant requested accommodations.

129.    Ms. Abbott also attempted to engage with Ms. Donahue in an interactive dialogue concerning her disability-related accommodation requests.

130.    Ms. Abbott further reiterated her disability-related accommodation request of being allowed to utilize a boot, scooter, or some other walking aid upon her return to work. Ms. Abbott also proposed the less burdensome alternative accommodation request involving a sooner return to work date of Monday, August 5, 2019 (approximately one week less than her initial request of August 12, 2019).

131.    Instead of discussing Ms. Abbott's request in any meaningful manner, Ms. Donahue curtly asked if Ms. Abbott would be able to return to her position without a walking aid after receiving her doctor's clearance.

132.    Thus, Ms. Donahue made clear that the Company would only consider allowing Ms. Abbott to return to her position so long as she would not seek to utilize the continued accommodation of a walking aid (such as a walking boot or scooter) after she returned.

133.    Ms. Abbott disclosed to Ms. Donahue that she certainly would be returning to her position but that she would likely need to be allowed to utilize a disability-related accommodation related to mobility and/or walking (such as a walking boot and/or scooter).

134.    Indeed, Ms. Abbott was able to perform all essential functions of her position (including, analysis, tracking and monitoring, and statistic work regarding the blood bank samples, as well as oversight of blood bank instruments, and completion of all required

paperwork/procedure manuals) with or without accommodations.  Indeed, especially with a

walking aid (such as a walking boot or scooter), Ms. Abbott would have had sufficient mobility

to perform all of the essential functions of her role.

135.     However, Ms. Donahue curtly remarked, "no, we cannot have that here," which

was a clear rejection of Ms. Abbott's request to be allowed to utilize a walking boot and/or the

scooter as a disability accommodation.

136.     Ms. Donahue made clear that the Company was not only refusing grant Ms.

Abbott's requested accommodations (including a return to work date of August 5, 2019 and the

subsequent utilization of a walking boot and/or scooter), but that the Company was also refusing

to engage in an interactive dialogue with Ms. Abbott about these accommodation requests, as

well as whether alternative accommodations could be found.

137.     Accordingly, Ms. Abbott was involuntarily terminated by the Company on or

around July 29, 2019.

138.     Indeed, the Company decided to terminate Ms. Abbott on July 29, 2019.

139.     Obviously, if the Company had asserted (implausibly) that it was an undue burden

for Ms. Abbott to stay out for an additional two weeks (until August 12) or an additional one

week (until August 5), Ms. Abbott would have initiated an interactive dialogue to explore

alternative accommodations that could have potentially allowed her to return earlier, whether at

the end of her FMLA protected leave period, on July 29, 2019, or some other date.

140.     Notably, it would not have been an undue burden for the Company to grant Ms.

Abbott her disability-related requested accommodations of a one week leave extension (to

August 5, 2019), or a two week leave extension (to August 12, 2019).  Indeed, during her

employment the Company never asserted to Ms. Abbott that it believed either of the requested leave extensions would impose an undue burden.

141.    Likewise, it would not have been an undue burden for the Company to grant Ms. Abbott her disability-related requested accommodations of the utilizations of one or more mobility aids once resuming work, such as a walking boot or scooter. Indeed, during her employment the Company never asserted to Ms. Abbott that it believed that allowing her (Ms. Abbott) to utilize a mobility aid such as a walking boot or scooter would impose an undue burden.

142.    Despite the Company's blatant refusal to grant Ms. Abbott's requested accommodations and its refusal engage in the interactive dialogue with Ms. Abbott, Ms. Abbott was fully intending to return, and would have been able to return, to work but was not given the chance.

143.    Indeed, Ms. Abbott's leave was protected under the FMLA at least until late July 2019.

144.    Upon Ms. Abbott's involuntary termination, the Company claimed that the justification for Ms. Abbott's termination was related to staffing issues.

145.    However, there were other employees at the Company that were able to perform Ms. Abbott's job functions and/or could have provided coverage during Ms. Abbott's absence.

146.    Indeed, Ms. Abbott's requested accommodation for her to stay out for an additional two weeks (until August 12) or an additional one week (until August 5), was not an undue burden on the Company, as Rachael O'Campo ("Ms. O'Campo"), the Hematology department supervisor and/or Andrew Mayerik ("Mr. Mayerik") were both employees who

would have been able to cover Ms. Abbott's position and/or could have been utilized to provide coverage during Ms. Abbott's absence.

147.    Furthermore, Ms. Abbott was replaced by the younger and/or non-disabled individual, Ms. O'Campo, who was at least two decades younger than Ms. Abbott and, upon information and belief, was a non-disabled individual.

148.    Even if it would to be assumed, arguendo, that Ms. Abbott did miss work as the Company claims, the Company has a progressive discipline policy, wherein individuals are first disciplined with a verbal warning, then two written warnings, then a suspension, all before termination.

149.    Notably, the Company skipped at least four steps in its progressive discipline policy by summarily terminating Ms. Abbott when it did.  Thus, the Company failed to follow its own policies by terminating Ms. Abbott in the manner it did.

150.    On or around April 16, 2020, Ms. Abbott timely filed a Charge of Discrimination with the New York State Division of Human Rights ("NYSDHR"), which was cross filed with the United States Equal Employment Opportunity Commission ("EEOC").

151.    On or around October 5, 2020, Ms. Abbott informed the NYSDHR and EEOC of her intent to remove her charge to pursue her claims in court.

152.    On or around October 16, 2020, the NYSDHR issued a determination of an annulment of Ms. Abbott's election of administrative remedies to allow Ms. Abbott to file in court.

153.    On or around November 24, 2020, the EEOC issued a right to sue letter for Ms. Abbott.

154.    This lawsuit is timely filed.

## COUNT I

**(Disability Discrimination and Failure to Accommodate or Engage in an Interactive Dialogue in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

### Ms. Abbott v. the Company

155.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

156.    At all relevant times, the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§12101, et. seq. (hereinafter the "ADA") because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

157.    Ms. Abbott suffers (and at all relevant times suffered) from disabilities, including, type 2 diabetes, cardiac disease, chronic obstructive pulmonary disease ("COPD"), as well as chronic skin graft wounds (resulting from complications of a "drop foot" condition related surgery and/or compartment syndrome).

158.    Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, lifting, bending, concentrating, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself). Furthermore, Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) also substantially impair one or more major bodily function, including, but not limited to, Ms. Abbott's endocrine, circulatory, and/or respiratory system.

159.    Ms. Abbott's chronic skin graft wounds (resulting from complications of a "drop foot" condition related surgery and/or compartment syndrome) (each individually and all collectively) are physical impairments that substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, exercising, her ability to

move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself).

160.    Accordingly, Ms. Abbott is (and at all relevant times was) disabled under the ADA.

161.    At all relevant times, Ms. Abbott was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

162.    Ms. Abbott disclosed her disabilities to the Company, and/or the Company was aware of Ms. Abbott's disabilities, and/or the Company regarded Ms. Abbott as disabled.

163.    Ms. Abbott requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, a handicapped parking space for the Company's parking lot, being provided with (and allowed to retain possession of) a stable stool, being reassigned from job assignments that required excessive standing and/or walking (that were not within Ms. Abbott's typical job responsibilities), a temporary leave of absence, and being allowed to utilize a boot and/or scooter as a walking aid.

164.    The disability-related accommodations requested by Ms. Abbott did not pose an undue burden on the Company.

165.    The Company failed to engage in an interactive dialogue and unlawfully denied (or revoked) one or more of Ms. Abbott's accommodation requests, including, but not limited to, a handicapped parking space for the Company's parking lot, being provided with (and allowed to retain possession of) a stable stool, being reassigned from job assignments that required excessive standing and/or walking (that were not within Ms. Abbott's typical job

responsibilities), a temporary leave of absence, and being allowed to utilize a boot and/or scooter as a walking aid.

166.    The Company discriminated against Ms. Abbott due to her disabilities by subjecting Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

167.    Upon information and belief, the Company replaced Ms. Abbott with a lesser or similarly qualified, non-disabled employee.

168.    Non-disabled employees of the Company were treated more favorably than Ms. Abbott including through not being improperly harassed, not being subjected to a hostile work environment, not being held to a higher standard, being given the benefit of progressive discipline/performance management prior to termination, and/or not being terminated.

169.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Abbott.

170.    Notably, upon information and belief, at the time of Ms. Abbott's termination, the Company employed at least 500 employees.

171.    As a direct and proximate result of the Company's violation of the ADA, Ms. Abbott has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

172.    Ms. Abbott seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

### COUNT II

**(Disability Discrimination and Failure to Accommodate or Engage in an Interactive Dialogue in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)**

**Ms. Abbott v. All Defendants**

173.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

174.    The Company is an employer under the definition of the New York State Human Rights Law because, at all relevant times, it employed four or more persons.

175.    Ms. Abbott suffers (and at all relevant times suffered) from disabilities, including, type 2 diabetes, cardiac disease, chronic obstructive pulmonary disease ("COPD"), as well as chronic skin graft wounds (resulting from complications of a "drop foot" condition related surgery and/or compartment syndrome).

176.    Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each individually and all collectively) substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, lifting, bending, concentrating, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself). Furthermore, Ms. Abbott's type 2 diabetes, cardiac disease, and COPD (each

individually and all collectively) also substantially impair one or more major bodily function, including, but not limited to, Ms. Abbott's endocrine, circulatory, and/or respiratory system.

177.    Ms. Abbott's chronic skin graft wounds (resulting from complications of a "drop foot" condition related surgery and/or compartment syndrome) (each individually and all collectively) are physical impairments that substantially limit one or more of her major life activities, including but not limited to, Ms. Abbott's walking, standing, exercising, her ability to move, ability to engage in physical activity, and her ability to perform daily manual tasks (such as caring for oneself).

178.    Accordingly, Ms. Abbott is (and at all relevant times was) disabled under the New York State Human Rights Law.

179.    At all relevant times, Ms. Abbott was a qualified employee and was capable of performing the essential functions of her job with or without one or more reasonable accommodations.

180.    Ms. Abbott disclosed her disabilities to the Defendants, and/or the Defendants were aware of Ms. Abbott's disabilities, and/or the Defendants regarded Ms. Abbott as disabled.

181.    Ms. Abbott requested and/or utilized disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included, but were not limited to, a handicapped parking space for the Company's parking lot, being provided with (and allowed to retain possession of) a stable stool, being reassigned from job assignments that required excessive standing and/or walking (that were not within Ms. Abbott's typical job responsibilities), a temporary leave of absence, and being allowed to utilize a boot and/or scooter as a walking aid.

182.    The disability-related accommodations requested by Ms. Abbott did not pose an undue burden on Defendants.

183.    The Defendants failed to engage in an interactive dialogue and unlawfully denied (or revoked) one or more of Ms. Abbott's accommodation requests, including, but not limited to, a handicapped parking space for the Company's parking lot, being provided with (and allowed to retain possession of) a stable stool, being reassigned from job assignments that required excessive standing and/or walking (that were not within Ms. Abbott's typical job responsibilities), a temporary leave of absence, and being allowed to utilize a boot and/or scooter as a walking aid.

184.    Defendants discriminated against Ms. Abbott due to her disabilities by subjecting Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

185.    Non-disabled employees of the Company were treated more favorably than Ms. Abbott including through not being improperly harassed, not being subjected to a hostile work environment, not being held to a higher standard, being given the benefit of progressive discipline/performance management prior to termination, and/or not being terminated.

186.    Upon information and belief, Ms. Dering was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision(s) to improperly deny requested reasonable accommodations and to terminate Ms. Abbott.

187. Upon information and belief, Ms. Donahue was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision(s) to improperly deny requested reasonable accommodations and to terminate Ms. Abbott.

188. Upon information and belief, the Company replaced Ms. Abbott with a lesser or similarly qualified, non-disabled employee.

189. Ms. Dering discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

190. Ms. Dering aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

191. Ms. Donahue discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

192. Ms. Donahue aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

193. Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Abbott and/or conduct so reckless to amount to such disregard.

194. As a direct and proximate result of the Defendants' violations of the New York State Human Rights Law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

195.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, punitive damages, interest, attorney's fees, and costs.

## COUNT III

**(Age Discrimination and Retaliation in Violation of 29 U.S.C. §§ 621 et seq.)**

**Ms. Abbott v. The Company**

196.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

197.    The Company is an employer under the definition of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. (hereinafter, "ADEA") because the Company is engaged in an industry affecting commerce and has twenty or more employees for each working day in each of twenty or more calendar weeks during the relevant years.

198.    Ms. Abbott was born in 1958 and, at all relevant times, was over 40 years old.

199.    The Company, including, through their agents, harassed and discriminated against the Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of the Plaintiff's age and/or because Plaintiff was over 40 years old.

200.    Furthermore, Mr. Abbott engaged in protected activity under the ADEA, including, but not limited to, by opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Abbott's age. Defendants retaliated against the Plaintiff and/or discriminated against the

Plaintiff for opposing an act or practice made unlawful by the ADEA by subjecting Ms. Abbott to adverse actions.

201.     More specifically, and by way of illustration, the Company subjected Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

202.     Indeed, upon information and belief, Ms. Abbott was replaced by an individual who younger than she was.

203.     The Company willfully violated the ADEA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Abbott.

204.     The Company willfully violated the ADEA because the Company knew or should have known its conduct was prohibited by Federal law and/or the Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Abbott.

205.     As a direct and proximate result of the Company's violations of the ADEA, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

206.     Ms. Abbott seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary

losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, liquidated (i.e., double) damages, interest, attorney's fees, and costs.

## COUNT IV

### (Age Discrimination in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)

### Ms. Abbott v. All Defendants

207.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

208.    Ms. Abbott was born in 1958 and, at all relevant times, was over 40 years old.

209.    The Defendants, including, but not limited to, through their agents, harassed and discriminated against the Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of the Plaintiff's age and/or because Plaintiff was over 40-years-old.

210.    More specifically, and by way of illustration, the Company subjected Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

211.    Indeed, upon information and belief, Ms. Abbott was replaced by an individual who younger than she was.

212.    Upon information and belief, Ms. Dering was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision to terminate Ms. Abbott.

213.    Upon information and belief, Ms. Donahue was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision to terminate Ms. Abbott.

214.    Ms. Dering discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

215.    Ms. Dering aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

216.    Ms. Donahue discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

217.    Ms. Donahue aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

218.    Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Abbott and/or conduct so reckless to amount to such disregard.

219.    As a direct and proximate result of the Defendants' violations of the New York State Human Rights Law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

220.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, uncapped compensatory damages (including, but not limited to, emotional distress damages,

reduced earning capacity, and lost compensation and benefits, including back pay and front pay),

punitive damages, interest, attorneys' fees, and costs.

## COUNT V

## (Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)

## Ms. Abbott v. The Company

221.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully

herein.

222.    Ms. Abbott engaged in protected activity under the ADA, including, but not

limited to: (i) opposing, voicing protected concerns, and/or engaging in other protected activity

related to the harassing and discriminatory actions taken by the Company due to Ms. Abbott's

disabilities; (ii) requesting and/or utilizing reasonable accommodations for disabilities which

were intended to allow Ms. Abbott to perform the essential functions of her job; and/or (iii)

opposing, voicing protected concerns, and/or engaging in other protected activity related to the

failure of the Company to provide (or the revocation of) requested disability-related reasonable

accommodations and/or the failure of the Company to engage in an interactive dialogue related

to Ms. Abbott's disabilities and requested accommodations.

223.    The disability-related accommodations which the Company retaliated against Ms.

Abbott for requesting and/or utilizing included, but were not limited to, a handicapped parking

space for the Company's parking lot, being provided with (and allowed to retain possession of) a

stable stool, being reassigned from job assignments that required excessive standing and/or

walking (that were not within Ms. Abbott's typical job responsibilities), a temporary leave of

absence, and being allowed to utilize a boot and/or scooter as a walking aid.

224.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Abbott's exercising of, or enjoyment of, one or more rights granted by the ADA.

225.    More specifically, the Company subjected Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

226.    The Company acted with malice and/or with reckless indifference to the federally protected rights of Ms. Abbott.

227.    As a direct and proximate result of the Company's violation of the ADA, Ms. Abbott has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

228.    Ms. Abbott seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, punitive damages, interest, attorney's fees, and costs.

## COUNT VI

### (Retaliation in Violation of the New York State Human Rights Law, Executive Article 15, Section 296)

### Ms. Abbott v. All Defendants

229.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

230.    Ms. Abbott engaged in protected activity under the New York State Human Rights Law, including, but not limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity related to the harassing and discriminatory actions taken by the Company due to Ms. Abbott's disabilities and/or age; (ii) requesting reasonable accommodations for disabilities which were intended to allow Ms. Abbott to perform the essential functions of her job; and/or (iii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the failure of the Company to provide (or the revocation of ) requested disability-related reasonable accommodations and/or the failure of the Company to engage in an interactive dialogue related to Ms. Abbott's disabilities and requested accommodations.

231.    The disability-related accommodation requests which Defendants retaliated against Ms. Abbott for requesting and/or utilizing included, but were not limited to, a handicapped parking space for the Company's parking lot, being provided with (and allowed to retain possession of) a stable stool, being reassigned from job assignments that required excessive standing and/or walking (that were not within Ms. Abbott's typical job responsibilities), a temporary leave of absence, and being allowed to utilize a boot and/or scooter as a walking aid.

232.    Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Ms. Abbott's exercising of or enjoyment of rights granted by the New York State Human Rights Law.

233.    More specifically, Defendants subjected Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

234.    Upon information and belief, Ms. Dering was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision(s) to improperly deny requested reasonable accommodations and to terminate Ms. Abbott.

235.    Upon information and belief, Ms. Donahue was involved in the decision(s) to undertake adverse actions against Ms. Abbott, including the decision(s) to improperly deny requested reasonable accommodations and to terminate Ms. Abbott.

236.    Ms. Dering discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

237.    Ms. Dering aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

238.    Ms. Donahue discharged, expelled, barred, and/or discriminated against Ms. Abbott in her compensation, conditions, and/or privileges of employment based on rights afforded to Ms. Abbott under the NYSHRL.

239.    Ms. Donahue aided, abetted, incited, coerced, and/or compelled the Company's discriminatory conduct, including, but not limited to, by providing or attempting to provide assistance to individuals participating in conduct forbidden under the NYSHRL.

240.    Defendants' actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. Abbott and/or conduct so reckless to amount to such disregard.

241.    As a direct and proximate result of Defendants' violation of the New York State Human Rights Law, Ms. Abbott has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

242.    The Plaintiff seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, punitive damages,  interest, attorney's fees, and costs.

## COUNT VIII

### (Interference and Retaliation for Exercising Rights under the Family and Medical Leave Act – 29 U.S.C. §2615)

### Ms. Abbott v. All Defendants

243.    Ms. Abbott incorporates all paragraphs above and below as if set forth fully herein.

244.    During all relevant times, the Company was engaged in an industry affecting commerce and employed 50 or more employees for 20 or more calendar work weeks in each current and/or preceding calendar year.

245.    Additionally, at all relevant times, the Company employed 50 or more employees within 75 miles of Ms. Abbott's worksite.

246.    As such, at all relevant times, the Company was an employer under the FMLA.

247.    At all relevant times, the Company employed 50 or more employees within 75 miles of Ms. Abbott's worksite.

248.    At all relevant times, Ms. Abbott had worked for the Company for 12 or more months and had worked in excess of 1,250 hours within the past 12-month period.

249.    As such, Ms. Abbott was an eligible employee under the FMLA.

250.    Ms. Abbott's type 2 diabetes, cardiac disease, chronic obstructive pulmonary disease ("COPD"), as well as physical disabilities such as chronic skin graft wounds (resulting from complications of a "drop foot" condition related surgery and/or compartment syndrome) constituted serious medical conditions causing periods of incapacity (for more than three days) with continuing treatment by a health care provider.

251.    Ms. Abbott was entitled to FMLA leave.

252.    Ms. Abbott sought to exercise her rights under the FMLA, including by requesting one or more protected leaves under the FMLA; by requesting time off for specific disability-related reasons that the Company knew, or should have known, qualified Ms. Abbott for protections under the FMLA, and/or requesting information regarding her eligibility and/or entitlement to a protected leave under the FMLA; and/or informing her employer of the likelihood that she would be requesting a protected leave under the FMLA in the future.

253.    Ms. Abbott timely notified Defendants that she would need FMLA leave.

254.    Defendants interfered with, restrained, and/or denied the exercise of, or the attempted exercise of, Ms. Abbott's rights under the FMLA.

255.    For example, when Ms. Abbott attempted to return and from her protected FMLA leave and/or shortly after she utilized her protected FMLA leave, Defendants refused to allow Ms. Abbott to return and/or refused to return Ms. Abbott to her position. Ms. Abbott was instead terminated.

256.    Indeed, Defendants discouraged Ms. Abbott from utilizing leave and/or disciplined or retaliated against Ms. Abbott for utilizing FMLA leave by terminating her.

257.    Defendants, including by and through their agents, retaliated and/or discriminated against Ms. Abbott for requesting and/or utilizing FMLA leave by subjecting Ms. Abbott to adverse actions, including, but not limited to, subjecting Ms. Abbott to a harassing and otherwise hostile work environment, failing to follow its own policies with regard to Ms. Abbott, holding Ms. Abbott to a higher standard than her non-disabled colleagues, and/or denying Ms. Abbott the benefit of progressive discipline prior to termination, and terminating Ms. Abbott's employment.

258.    Ms. Dering was an employer under the FMLA because she had the power to hire and/or fire Ms. Abbott, supervised and controlled Ms. Abbott's conditions of employment, including her work schedule, played a role in determining Ms. Abbott's rate and method of payment, and/or played a role in maintaining Ms. Abbott's employment records.

259.    Ms. Donahue was an employer under the FMLA because she had the power to hire and/or fire Ms. Abbott, supervised and controlled Ms. Abbott's conditions of employment, including her work schedule, played a role in determining Ms. Abbott's rate and method of payment, and/or played a role in maintaining Ms. Abbott's employment records.

260.    Defendants' actions were willful and undertaken in bad faith.

261.    As a direct and proximate result of the Defendants' violation of the FMLA, Ms. Abbott has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits (including due to her demotion, her reduction in work hours, and her termination), other monetary harms, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

262.    Ms. Abbott seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, liquidated (i.e. double) damages, interest, attorney's fees, and costs.

WHEREFORE, the plaintiff, Valerie Abbott, respectfully requests that this honorable court:

A.  Schedule this matter for trial by jury, and;

B.  Find the Defendants liable on all counts;

C.  Award the Plaintiff monetary damages, including, but not limited to, back pay, lost compensation and benefits, front pay, and other monetary harms;

D.  Award the Plaintiff damages for emotional distress;

E.  Award the Plaintiff compensatory damages, including, but not limited for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish and, loss of enjoyment of life;

F.  Award the Plaintiff damages for harm to reputation and reduced earning capacity;

G.  Award the Plaintiff liquidated (i.e. double) damages;

H.  Award the Plaintiff punitive damages;

I.   Award the Plaintiff her reasonable attorney's fees;

J.   Award the Plaintiff interest and costs;

K.  Award the Plaintiff all other damages to which she is entitled; and

L.   Grant such further relief as is just and equitable.

Respectfully Submitted,

VALERIE ABBOTT

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date:   12/2/2020           By:

Benjamin R. Wyatt, (#5604590)
BWyatt@Wyattlegalservices.com

Michael R. Varraso (#5619291)
MVarraso@Wyattlegalservices.com

Katherine A. Gabriel (#5782487)
Katherine@Wyattlegalservices.com

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1111
Facsimile: (603) 685-2868

New York Office:
418 Broadway, 2nd Floor
Albany, NY 12207
Telephone: (603) 357-1112
Facsimile: (603) 685-2868